UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LEROY R. WHITTENBERGER,

        Plaintiff,

        v.                                      Case No. 23-cv-1589-bhl

DANIEL LA VOIE et al.,

        Defendants.

## DECISION AND ORDER

Plaintiff Leroy Whittenberger is an inmate at the New Lisbon Correctional Institution who is represented by Lonnie D. Story in this 42 U.S.C. §1983 action. He is proceeding on medical care claims under the Eighth Amendment based on allegations that Defendants were deliberately indifferent to his knee injury. On November 12, 2024, Defendants Dr. Barry Daughtry and Nurse Lisa Payne separately moved for summary judgment, and on November 26, 2024, Defendants Daniel La Voie, Melissa McFarlane, and Koreen Frisk also moved for summary judgment. For the reasons explained below, the Court will grant the motions and dismiss this action.

### BACKGROUND

At the relevant time, Whittenberger was incarcerated at the New Lisbon Correctional Center, where Defendant Barry Daughtry worked as a contracted physician and Defendant Lisa Payne worked as a contracted nurse. Also during that time, Defendant Dr. Daniel La Voie worked for the Department of Corrections (DOC) as the Medical Director, and Defendants Koreen Frisk and Melissa McFarlane worked for the DOC as nurses at New Lisbon Correctional Center.

On May 12, 2021, a nurse (who is not a Defendant) saw Whittenberger for complaints of right knee pain while he was standing and walking. Whittenberger described his knee pain as a

ten out of ten. The nurse educated Whittenberger on the use of medication and how to use ice; he also showed Whittenberger how to wrap his knee with an Ace bandage. The nurse offered Whittenberger crutches, but he refused them because he did not live on the first floor. The nurse also informed Whittenberger that he would contact an advance care provider about ordering an x-ray and/or physical therapy. Dkt. No. 72 at ¶¶8-11; Dkt. No. 83 at ¶2.

At this time, Dr. La Voie was not Whittenberger's provider; however, he was providing direction to nursing staff because there was no onsite advance care provider at New Lisbon Correctional Center. The nurse left a message for Dr. La Voie about Whittenberger, informing him that Whittenberger complained of acute knee pain, possibly in his meniscus area, that started five days earlier while he was exercising. The nurse noted there was no swelling or redness and advised that medication, ice, and an Ace wrap had been administered. The nurse asked if Dr. La Voie recommended an x-ray and physical therapy consultation. Dkt. No. 72 at ¶¶12-13.

Dr. La Voie responded on May 17, 2021, stating that Whittenberger should follow up with nursing if his pain did not resolve within four weeks. Dr. La Voie explains that, based on the information provided to him, his professional opinion was that Whittenberger's knee injury was a "low energy injury which occurred during exercise." Although Dr. La Voie does not explain what he means by "low energy injury," he explains he believed conservative treatment was appropriate because such injuries most often involve soft tissue (rarely bone injuries) and generally heal within four weeks with basic treatments such as rest, ice, wrapping, and ibuprofen. Dr. La Voie did not believe an x-ray or physical therapy was needed because Whittenberger's complaints were being addressed with conservative measures that would allow healing of a soft-tissue injury. An x-ray would not show a soft-tissue injury, and rest rather than active physical therapy was more appropriate at this stage. Dkt. No. 72 at ¶¶14-19.

On May 16, 2021, Whittenberger submitted a health service request stating that his knee pain was getting worse and that the Tylenol was not working. Nurse McFarlane responded the next day and informed him that he was already prescribed naproxen, so he could not also be prescribed ibuprofen. She also let him know that nursing staff could assess him for a low bunk restriction, if he would like. Eleven days later, on May 27, 2021, Whittenberger submitted a health service request stating that his knee pain was not getting any better and requesting to see a doctor. A nurse (who is not a Defendant) told him to continue with the ice and medication and to continue resting, wrapping, and elevating his knee. The nurse also instructed him to file another request if the pain persisted after four weeks. On June 15, 2021, Whittenberger was seen by a nurse (who is not a Defendant) for complaints of persistent knee pain. The nurse instructed Whittenberger to continue with the plan of care, she also offered Whittenberger crutches and a low bunk restriction. She updated Dr. La Voie and requested an x-ray and physical therapy. Dkt. No. 72 at ¶¶20-25; Dkt No. 83 at ¶7.

On June 15, 2021, Dr. La Voie received an update about Whittenberger's continued knee pain. Dr. La Voie explains that he still believed Whittenberger suffered from a low energy injury, especially after learning that Whittenberger was not following the plan of care and that he had been weight-bearing since the injury. Dr. La Voie states that an x-ray would be indicated only if "functional impairment developed," but he did submit an order for physical therapy because Whittenberger should have made greater progress since his injury. Dr. La Voie explains that he thought a physical therapist might discover some other reason for the lack of progress. Dkt. No. 72 at ¶¶26-28.

On July 7, 2021, Whittenberger was seen by Nurse Payne, who informed him that physical therapy had been ordered. She noted that his knee "appear[ed] normal – not hot to touch, no

3

deformity seen, no edema seen, no discoloration seen." Nurse Payne also placed an order for Whittenberger to be seen by an on-site provider and sent Whittenberger a letter informing him of the referral. Dkt. No. 73 at ¶¶10-17.

Whittenberger's first physical therapy appointment was less than two weeks later, on July 19, 2021. On August 16, 2021, the physical therapist noted that, while Whittenberger was making "mild functional progress, he has been poorly responsive to PT." Less than a week later, on August 20, 2021, Whittenberger was evaluated by Dr. Daughtry, who became Whittenberger's primary care provider. At this point, Dr. La Voie stopped being directly involved in Whittenberger's care. Dr. Daughtry ordered an x-ray of Whittenberger's knee and directed Whittenberger to follow up in four weeks. Dr. Daughtry next saw Whittenberger on October 1, 2021, at which time he noted that the x-ray showed "an uncertain or old fracture" in Whittenberger's knee. He also noted that Whittenberger's knee had been locking and popping for the past couple of weeks. Dr. Daughtry ordered an MRI and referred Whittenberger to an orthopedic surgeon for evaluation. Dr. Daughtry also advised Whittenberger to use crutches for the next couple of weeks. Although Dr. Daughtry placed the order for an MRI, he had no control over when the MRI would be scheduled as the scheduling responsibility belongs to others at the institution and depends on availability at the outside clinic. Dtk. No.71 at ¶¶4-12; Dkt. No. 72 at ¶¶29-35; Dkt. No. 73 at ¶21; Dkt. No. 83 at ¶13-14, 17.

About a month later, on November 2, 2021, Whittenberger submitted a health service request asking about when he would receive the MRI. Nurse McFarlane responded on November 5, 2021 that the MRI had been scheduled and would be coming up soon. Generally, assistants in the health services unit, not nurses, are responsible for scheduling whatever tests a provider orders. Because MRIs are not performed at the institution, appointments are scheduled based on the

clinic's availability. About a week later, on November 12, 2021, Whittenberger was seen by an orthopedic surgeon, who ordered a second x-ray. Her x-ray report did not note a fracture, but she did order a bone mineral density study. A few months later, in mid-February 2022, Whittenberger submitted health service requests asking about the MRI and bone scan. Nurses McFarlane and Frisk promptly responded and confirmed that both the MRI and bone scan had been ordered, and they informed him that he was then to see orthopedics for a follow-up. The bone density test was performed on February 23, 2022. The results indicated a low energy tibial plateau fracture. Dkt. No. 72 at ¶¶63-70, 79-89; Dkt. No. 83 at ¶¶25-27.

About a week later, in early March, Whittenberger asked about the status of the MRI. Dr. Daughtry examined Whittenberger and referred him to physical therapy for a brace fitting, he also directed Whittenberger to stay off his feet, to continue using the prescribed medication, and to follow up in three months. Dr. Daughtry also inquired about the status of the MRI, and he was informed that it had been scheduled. These were the last interactions Dr. Daughtry had with Whittenberger. Whittenberger had an MRI on March 25, 2022, and, unrelatedly, Dr. Daughtry stopped working at the institution that same day. Dkt. No.71 at ¶¶12-19; Dkt. No. 72 at ¶¶35-38; Dkt. 83 at ¶30.

A few weeks after the MRI, on April 19, 2022, Whittenberger was evaluated offsite by another orthopedic surgeon. Eventually, after other attempts at addressing Whittenberger's pain were unsuccessful, he underwent a partial knee replacement surgery on January 24, 2024. Two days later, Whittenberger submitted a health service request complaining that he had not received his pain medication. The next morning, on January 27, 2024, Nurse Frisk notified Whittenberger that his medication was in the health services unit. Whittenberger refused to get the medication in the morning, but he did go to the health services unit to get the medication during the evening

medication pass. He again refused to get them during the bedtime medication pass. Dkt. No. 72 at ¶¶39-45, 75-78.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Whittenberger asserts that Defendants were deliberately indifferent to his serious knee injury in violation of the Eighth Amendment. To survive summary judgment, Whittenberger must provide evidence from which a jury could reasonably conclude that Defendants intentionally disregarded a known, objectively serious medical condition that posed an excessive risk to his health. *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citations omitted). When assessing

6

whether a prison official acted with the requisite state of mind, courts must "examine the totality of an inmate's medical care." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (citations omitted). The Seventh Circuit has made clear that, to establish the requisite mental state, "something more than negligence or even malpractice is required." *Id.* A plaintiff must show "something approaching a total unconcern" for the prisoner's welfare. *See Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (citations omitted). "In other words, the [defendants] may escape liability even if they did not take perfect action." *Id.* at 821-22. Further, it is not enough for a plaintiff merely to show he disagrees with a medical provider's decision or even that medical providers disagree with each other. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Instead, a plaintiff must show that a provider's exercise of medical judgment was "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Id.*

Whittenberger presents evidence from which a jury could reasonably conclude that his knee injury was an objectively serious medical condition, so the only question is whether Defendants were deliberately indifferent to that condition. For the reasons explained below, the Court concludes that no jury could reasonably conclude that Defendants were deliberately indifferent to Whittenberger's knee injury.

1. **No jury could reasonably conclude that Dr. La Voie was deliberately indifferent to Whittenberger's knee injury.**

Dr. La Voie had minimal involvement in Whittenberger's care. As the DOC's medical director, he did not generally provide direct care to inmates; however, because the institution did not have an onsite provider when Whittenberger was injured, Dr. La Voie provided directions to nursing staff. On May 12, 2021, Whittenberger reported significant knee pain that began during exercise. In response, a nurse prescribed medication for pain and swelling, and instructed

Whittenberger on how to ice and wrap his knee. The nurse also offered Whittenberger crutches so that he could keep weight off the knee, but Whittenberger refused this offer because he did not live on the first floor. The nurse reported the injury to Dr. La Voie, who relied on the nurse's observations. Based on the information given to him, Dr. La Voie explains he concluded that the injury was most likely a soft-tissue injury, which would probably heal within weeks with basic treatments such as rest, ice, an Ace wrap, and medication for pain and swelling. Because Dr. La Voie believed the injury was a soft-tissue injury, he concluded that an x-ray was unnecessary since x-rays do not show soft-tissue damage. He also concluded that, at this time, physical therapy would be counterproductive because an injury of this nature requires rest to heal. Dr. La Voie directed the nurse to inform Whittenberger to continue with conservative treatments as directed by the nurse and to contact the health service unit again in four weeks if the symptoms progressed.

Four weeks later, Whittenberger still complained of pain. Dr. La Voie believed a soft-tissue injury should have made substantial progress at this point, so he decided to refer Whittenberger to physical therapy with the hope that the physical therapist might discover a reason for the lack of progress. Based on the information about how the injury occurred, Dr. La Voie continued to believe Whittenberger had a soft-tissue injury, so he did not recommend an x-ray. Whittenberger had his first physical therapy appointment about a month later, and about a month after that, Dr. Daughtry became Whittenberger's primary care provider. Dr. La Voie was not responsible for scheduling the physical therapy appointments.

No jury could reasonably conclude that, during the approximately three-month period that Dr. La Voie treated Whittenberger, he was deliberately indifferent to Whittenberger's knee injury. Dr. La Voie made a diagnosis based on the information given to him and formulated a treatment plan. He concluded that Whittenberger most likely suffered a soft-tissue injury that would heal

8

over time with conservative treatments.  During that time, Whittenberger was provided medication for pain and swelling, ice, and an Ace wrap.  When his injury did not heal as Dr. La Voie expected it would, he referred Whittenberger to a physical therapist for further evaluation.

With the benefit of hindsight, Whittenberger argues that Dr. La Voie should have done more, such as order an x-ray, because his injury was in fact not a soft-tissue injury.  But Whittenberger offers no evidence to suggest that, at the time of his injury, Dr. La Voie failed to use his professional medical judgment when diagnosing the injury and deciding how to proceed.  *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (holding that a medical professional's treatment decisions will be afforded deference unless no minimally competent professional would have responded as such under the circumstances).  At worst, Dr. La Voie's misdiagnosis might rise to the level of negligence, but it has long been recognized that neither medical malpractice nor even gross negligence is actionable under the Constitution.  *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).  And the mere fact that Dr. La Voie declined to order an x-ray when suggested by nursing staff does not suggest deliberate indifference, as it is not enough for a plaintiff merely to show that medical providers disagree with each other.  *Pyles*, 771 F.3d at 409.  Because Whittenberger has not provided evidence from which a jury could reasonably conclude that Dr. La Voie was deliberately indifferent to his knee injury, Dr. La Voie is entitled to summary judgment.

2. **No jury could reasonably conclude that Dr. Daughtry was deliberately indifferent to Whittenberger's knee injury.**

Dr. Daughtry was Whittenberger's primary care provider for about seven months, from August 20, 2021 through March 2022.  During his initial evaluation of Whittenberger, Dr. Daughtry ordered an x-ray, which he noted showed an "uncertain or old fracture."  In light of these results, and Whittenberger's continued complaints of pain, along with newly reported symptoms

of locking and popping, Dr. Daughtry ordered an MRI. He placed the order promptly, and although the MRI did not happen for some time, Dr. Daughtry was not responsible for scheduling MRIs. Scheduling was handled by administrative staff in the health services unit and was subject to availability of MRI equipment at an offsite clinic. Dr. Daughtry also referred Whittenberger to an orthopedic specialist, who examined Whittenberger and ordered a second x-ray and a bone scan; the orthopedic specialist did not order an MRI. Then, in response to Whittenberger's continued complaints of pain and questions about when the MRI would happen, Dr. Daughtry referred Whittenberger to a physical therapist for a brace, continued his medications, and directed Whittenberger to stay off his feet. Dr. Daughtry also followed up on the status of the MRI, which then occurred a few weeks later. All of these actions demonstrate that Dr. Daughtry reasonably and promptly attempted to address Whittenberger's knee injury. They are inconsistent with a finding of deliberate indifference.

While Whittenberger criticizes Dr. Daughtry's actions in hindsight, he has not come forward with evidence sufficient for a reasonable jury to find Dr. Daughtry deliberately indifferent with the meaning of the Eighth Amendment. Dr. Daughtry's evolving response to Whittenberger's persistent complaints does not suggest he was deliberately indifferent to Whittenberger's knee injury. Rather than persisting in an ineffective course of treatment, Dr. Daughtry ordered new diagnostic tests and referred Whittenberger to an offsite specialist. The pursuit of additional information and treatment options is not deliberate indifference, it is evidence of a medical professional attempting to solve a medical problem. And while Whittenberger would have preferred for the MRI, bone scan, and appointment with the orthopedic specialist to have occurred sooner than they did, he offers no evidence to suggest Dr. Daughtry was responsible for the delay. *See Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996) (holding that §1983 requires that a defendant

10

Case 2:23-cv-01589-BHL    Filed 02/27/25    Page 10 of 13    Document 86

be personally involved in an alleged deprivation to be liable). Indeed, after Whittenberger notified Dr. Daughtry that he still had not received the MRI, Dr. Daughtry affirmatively contacted those responsible for scheduling to check on the progress of his order. In short, Dr. Daughtry's responsiveness to Whittenberger's concerns do not reasonably suggest that he was deliberately indifferent to Whittenberger's condition, so Dr. Daughtry is entitled to summary judgment.

3. **No jury could reasonably conclude that Nurses Payne, McFarlane, and Frisk were deliberately indifferent to Whittenberger's knee injury.**

Nurses Payne, McFarlane, and Frisk had little involvement in Whittenberger's care beyond communicating information to him. On July 7, 2021, about three weeks after Dr. La Voie had referred Whittenberger to physical therapy, Nurse Payne evaluated Whittenberger in response to his complaints of continued knee pain. During this appointment, she confirmed that the order for physical therapy had been placed, and noted that, although Whittenberger complained of pain, his knee appeared normal—there was no swelling, it was not hot to the touch, there was no bruising or other discoloration. She also explained to him why Dr. La Voie did not believe an x-ray was appropriate. When Whittenberger asked about an MRI, she informed him that he would have to first see a provider because, as a nurse, she did not have the authority to order an MRI. Nurse Payne then placed an order for Whittenberger to be seen by an onsite provider.

Nothing in this limited interaction reasonably suggests that Nurse Payne was deliberately indifferent to Whittenberger's knee injury. As a nurse, her treatment options were limited. While she could not order medication or diagnostic tests, she could explain what the provider had decided and place an order for additional consultation with a provider, which is exactly what she did. Given that Whittenberger's knee appeared normal and given that Whittenberger provided no additional information to undermine Dr. La Voie's conclusion that Whittenberger had suffered a soft-tissue injury, no jury could reasonably conclude that Nurse Payne demonstrated deliberate indifference

when she deferred to Dr. La Voie's plan of care. *See Franklin v. Hannula*, 850 F. App'x 436, 439 (7th Cir. 2021) (explaining that a nurse does not demonstrate deliberate indifference when he/she defers to a doctor's instructions that pose no obvious and serious risk to the inmate's health). Nurse Payne is therefore entitled to summary judgment.

Finally, Nurses McFarlane and Frisk are entitled to summary judgment. These nurses provided Whittenberger with information about the scheduling of his appointments and tests. They were not responsible for scheduling the appointments or tests; they merely consulted a database to confirm the orders had been placed and/or scheduled. Whittenberger asserts that they should have been more proactive regarding the scheduling, but "[p]ublic officials do not have a free-floating obligation to put things to rights . . . . Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). No jury could reasonably conclude that McFarlane and Frisk were deliberately indifferent simply because they communicated the information that Whittenberger had requested, so they are entitled to summary judgment.

The Court understands Whittenberger's frustration about how long it took to diagnose and treat his knee pain, but delay is a common experience for people both inside and outside of prison, which is why "the Constitution does not mandate immediate care." *See Moore v. Williams*, 835 F. App'x 143, 145 (7th Cir. 2021). The scheduling of diagnostic tests and appointments with specialists is dependent on the availability of those administering the tests and of the specialists. The people requesting an appointment have little to no power in that process. This is why it is not enough for Whittenberger simply to point to a delay; instead, he was required to provide evidence that the delay was the result of a "culpable mental state," meaning that Defendants deliberately or even recklessly delayed the diagnosis and treatment of his injury. *See Burton v. Downey*, 805 F.3d

776, 785 (7th Cir. 2015). Whittenberger has failed to present any evidence supporting such a conclusion, so Defendants are entitled to summary judgment.

**IT IS THEREFORE ORDERED** that Defendants' motions for summary judgment (Dkt. Nos. 48, 54, 59) are **GRANTED** and this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on February 27, 2025.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.